# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00352-CR

**The State of Texas, Appellant**

**v.**

**William Derek Groves, Appellee**

### FROM THE 27TH DISTRICT COURT OF LAMPASAS COUNTY
### NO. 10,552, THE HONORABLE JOHN GAUNTT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

William Derek Groves was indicted for the state-jail felony of possessing five pounds or less but more than four ounces of marijuana. *See* Tex. Health & Safety Code § 481.121(a), (b)(3). He moved to suppress all evidence seized by officers resulting from their December 4, 2020 search of his home. After an evidentiary hearing, the trial court granted the motion and entered findings of fact and conclusions of law. In two appellate issues, the State contends that the trial court erred by making (1) fact findings that are unsupported by the record and inconsistent with conclusive evidence to the contrary, particularly a bodycam recording, and (2) a conclusion that Groves did not give lawful consent for the search and seizure. We affirm.

## BACKGROUND

While Groves was out of town, his ex-wife called police and reported that there was marijuana at his house. She lied to the police and said that she was there to pick up her minor son, even though she already had the son and it was not a scheduled pick-up day.

Two Lampasas Police Department officers, Investigator Nicholas Roberts and Officer John Bowman, went to the home that day to investigate. When they arrived, no one was home. They immediately walked up the driveway and walked to the rear of the home to a detached carport connected to a small, brick structure and a large fenced-in backyard. Roberts crawled over some wood and looked through the windows of the structure, but he saw nothing illegal.

Then Bowman called him back towards the south side of the home to a small attached garage and greenhouse. Walking back, Roberts smelled marijuana. He looked through a window of the greenhouse through a small rip in the window screen and saw what he believed to be marijuana plants. He didn't "have to manipulate anything or move anything to look through."

The officers discussed what to do next, and Roberts said that they will "call Mr. Groves and explain to him that this one here [the marijuana] we are going to seize because we['ve] seen it" from the driveway. During the call Bowman told Groves, "I've already located your marijuana grow inside your house," "you just need to come here to meet us so we can talk about it," and "I'm not here to play games." Groves explained that he was out of town and his adult son, who lives with him sometimes, was there earlier when his ex-wife came to the house alone. Then Roberts told him that "we are going to seize that marijuana" but "we want to be as least intrusive about it as we can—we don't want to cause property damage" and "we're gonna confiscate what's illegal." He asked Groves "for consent to search the house" to ward off the need for the officers to get a warrant and told him, "we have to get that, and I do not want to cause property damage to your house." Groves, according to Roberts, "ultimately g[a]ve [him] consent to search the house." Groves said that he'd be glad to have his adult son open the home up. Groves then called his son and called the officers back to tell them that his son was on the way to open "that room" up for the officers and the rest of the home as well. During this second call with

2

Groves, Roberts told him that he would not be arrested that day but that if he did not give his consent for the officers to go inside, they would soon prepare a search warrant so they could go inside that day, and Groves responded that his son was on the way.

The son soon arrived, and the officers called Groves again to confirm his consent to search the home, including that he was allowing his son to let the officers "into the house into the side room" where they saw the plants. They told him that he had the right to withdraw consent at any time, by calling his son and then having him pass the phone to the officers for Groves to talk to them, and Groves responded, "OK." They ended the call; the son let the officers in the home, including into the greenhouse; they seized over four ounces of what they believed to be marijuana; and they called Groves to tell him when they had finished.

The State indicted Groves for state-jail-felony possession of marijuana, and he moved to suppress all evidence that resulted from the officers' search. During the hearing on the motion, Roberts and Groves both testified. Roberts agreed that "a fair conclusion from that" property-damage "statement" that he made to Groves during their first phone call is that if the homeowner doesn't "do something, they're going to cause property damage and get into my house." About the ex-wife's tip, Roberts had not believed that the ex-wife had been trespassing because "it was involving a child pickup or a drop-off." But he agreed that it's "common sense" that "an ex" would not customarily "go looking into the side windows of a residence of her ex-husband" for a child "pickup and delivery." He also said that it's "a fair statement" that he had "no information whatsoever that [the ex-wife] had a right to be where she was when she allegedly saw this alleged marijuana." And he did not know her "visitation schedule if she would be picking up or delivering that day" and did not know of any other reason for her to be at Groves's home.

3

About the home itself, he said that a visitor would approach by going to the front door, which meant that "the south side" would be outside that visitor "boundary."

Groves explained his contentious relationship with his ex-wife and the custody schedule, including that his ex-wife's picking their minor son up on the day in question would not have been the schedule because she had possession of him already that day. And though Groves admitted telling "the officers that they could go into [his] house," he explained that he did so based on his view "that if I was compliant and allowed them to go ahead, that they could just take that and leave, [and] there would be no need for arrest or break [sic] anything to enter the home, [and] that they would just take it and go[,] and we would sort it out" in the coming days.

Also during the hearing, the trial court admitted into evidence the State's two exhibits—the police report of the search and Bowman's bodycam recording of the relevant events. But afterward, the court granted Groves's motion to suppress. The court made the following findings of fact and conclusions of law in support of its ruling:

> The State stipulated that a warrantless search of Defendant's home was done on December 4, 2020. The State contended that the search was based on Defendant's consent, and the evidence found was therefore admissible. The Court granted the Motion to Suppress.
>
> Findings of Fact
>
> 1.      Defendant had a contentious relationship with his ex-wife, Judith McGinty. She reported to authorities that there was a marijuana grow at Defendant's house. She reported to Officer Bowman that she had been at the house to pick up their son and that while she was there she could smell a strong odor of marijuana, and looked into a room from outside the house and could see marijuana plants growing inside the house.
>
> 2.      Bowman met with [Investigator] Roberts and they went to investigate the house. Bowman reported that when they arrived "I exited my patrol car and I could immediately smell a strong odor of marijuana from the street," quoting from his offense report.

4

3.     [Investigator] Roberts testified that he could not smell marijuana until he was on the property, looking through the crack of the window covering and could then see the growing marijuana plants.

4.     [Investigator] Roberts contacted Defendant who was in San Antonio and told him they were going to enter his house and confiscate the evidence and if he did not want his house damaged he should get someone to open it up.

5.     The house was ultimately opened and evidence seized.

6.     [Investigator] Roberts testified that he thought that he could smell illegal marijuana, but could not tell the growing plants apart.

7.     Defendant testified that his relationship with hi[s] ex-wife was contentious.  That she was not on his premises with permission, and she had had possession of the child since earlier in the week.

8.     The Court finds that Bowman's report is not credible.  The Court finds that Judith McGinty's reports, if made, are not credible.  The Court finds that the Defendant's testimony is credible.  The Court finds that [Investigator] Roberts['s] testimony about only smelling marijuana when he was looking through the window coverings is credible.

9.     The Court finds that the search was not made with informed consent.

10.     The Court finds that no exigent circumstances existed upon which a warrantless search of Defendant's home could be conducted.

Conclusions of Law

11.     The search of Defendant's home was made without a warrant, no exigent circumstances existed which would justify the search, and the search was not made with informed consent. The Motion to Suppress is Granted, and any evidence obtained therefrom is excluded from evidence.

The State now appeals the suppression order.


**STANDARD OF REVIEW AND APPLICABLE LAW**

We review a suppression order under a bifurcated standard of review.  *State v. Pena*, 581 S.W.3d 467, 474 (Tex. App.—Austin 2019, pet. ref'd) (quoting *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015)).  We give almost total deference to (i) the trial

5

court's findings of historical facts if those findings are supported by the record and (ii) its application of the law to questions of fact, and to mixed questions of fact and law, if the application depended on evaluating witness credibility or demeanor. *See State v. Granville*, 423 S.W.3d 399, 404 (Tex. Crim. App. 2014); *Pena*, 581 S.W.3d at 474 (quoting *Cuong Phu Le*, 463 S.W.3d at 876; *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010)). "If the trial court makes a finding of fact that is derived from video evidence admitted at a suppression hearing, that finding 'is still reviewed under a deferential standard.'" *Pena*, 581 S.W.3d at 474 (quoting *Carter v. State*, 309 S.W.3d 31, 40 (Tex. Crim. App. 2010)). By contrast, we review *de novo* the court's legal conclusions and the rest of its application of the law to the facts. *See id.* (quoting *Cuong Phu Le*, 463 S.W.3d at 876).

We view the record in the light most favorable to the trial court's decision. *Granville*, 423 S.W.3d at 404; *Pena*, 581 S.W.3d at 474 (quoting *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014)). We must affirm the trial court's order "if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory, but 'a trial court's ruling will not be reversed based on a legal theory that the complaining party did not present to it.'" *Pena*, 581 S.W.3d at 474 (quoting *Story*, 445 S.W.3d at 732); *accord Hailey v. State*, 87 S.W.3d 118, 122 (Tex. Crim. App. 2002). "When there are no written findings explaining the factual basis for the trial judge's decision, we imply findings of fact that support his ruling so long as the evidence supports those implied findings." *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011).

The Fourth Amendment assures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Our state constitution likewise provides that "[t]he people shall be secure in their persons, houses, papers

and possessions, from all unreasonable seizures or searches." Tex. Const. art. I, § 9. Because of these guarantees, officers generally must obtain a warrant before conducting searches or seizing items unless an exception to the default warrant requirement applies. *See Collins v. Virginia*, 138 S. Ct. 1663, 1669 (2018); *State v. Villarreal*, 475 S.W.3d 784, 796 (Tex. Crim. App. 2014); *Pena*, 581 S.W.3d at 480–81. The State bears the burden of proving an exception to the default warrant requirement. *See State v. Martinez*, 569 S.W.3d 621, 624 (Tex. Crim. App. 2019).

Absent proof of a recognized exception to the warrant requirement, evidence obtained in violation of the federal or state constitutions, or a state statute, and without a warrant should be suppressed. *See* Tex. Code Crim. Proc. art. 38.23(a). Thus, all direct and indirect products of a search or seizure should be suppressed when illegal conduct has been established and it is also shown that the evidence in question "has been come at by exploitation of that illegality." *See Wong Sun v. United States*, 371 U.S. 471, 484, 488 (1963); *Wehrenberg v. State*, 416 S.W.3d 458, 464 (Tex. Crim. App. 2013); *State v. Iduarte*, 268 S.W.3d 544, 550–51 (Tex. Crim. App. 2008). The defendant bears the initial Article 38.23(a) burden to show a "causal connection" between the illegality and the evidence seized or found by a search and sought to be suppressed. *See Wehrenberg*, 416 S.W.3d at 468; *Pham v. State*, 175 S.W.3d 767, 772 (Tex. Crim. App. 2005).

One exception to the default warrant requirement for a search of a home is the homeowner's voluntary consent to the search. *See Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012); *Meekins*, 340 S.W.3d at 458. "[T]wo competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." *Tucker*, 369 S.W.3d at 185 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

7

A person's voluntariness in consenting is to be determined from all the circumstances. *See id.*; *Meekins*, 340 S.W.3d at 459. Consent that is "coerced, by explicit or implicit means, by implied threat or covert force," is not voluntary. *See Meekins*, 340 S.W.3d at 459 & n.15 (quoting *Schneckloth*, 412 U.S. at 228); *accord Tucker*, 369 S.W.3d at 185. Further, consent resulting from "physical *or* psychological pressures brought to bear by law enforcement" can be involuntary. *Fienen v. State*, 390 S.W.3d 328, 333 (Tex. Crim. App. 2012) (citing *Meekins*, 340 S.W.3d at 458–59); *accord State v. Ruiz*, 581 S.W.3d 782, 786 (Tex. Crim. App. 2019). We are to "review the totality of the circumstances of a particular police–citizen interaction from the point of view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen" and decide "whether the person's 'will ha[s] been overborne and his capacity for self-determination critically impaired,' such that his consent to search must have been involuntary." *Meekins*, 340 S.W.3d at 459 (internal quotation omitted) (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)). Many factors can be involved in reviewing voluntariness, including "physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances." *Id.* at 460 n.26 (internal quotation omitted) (quoting *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998)). "An officer's request for consent to search does not taint an otherwise consensual encounter as long as the police do not convey a message that compliance with their request is required." *Meekins*, 340 S.W.3d at 460 n.26 (quoting *Pena*, 143 F.3d at 1367).

The State must prove the voluntariness of a consent by clear and convincing evidence. *Id.* at 459. In part because of this burden of proof, we must accept a trial court's involuntariness finding "unless it is clearly erroneous." *Id.* at 460 & n.27 (citing *Juarez v. State*,

758 S.W.2d 772, 781 (Tex. Crim. App. 1988), *overruled on other grounds by Boyle v. State*, 820 S.W.2d 122, 132 n.10 (Tex. Crim. App. 1989)). The clear-error standard means that "the party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Id.* at 460 & n.28 (internal quotation omitted) (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)). Thus, when "there is more than one permissible view of the totality of the evidence" on consent, we are to affirm the trial court's decision. *See id.* at 465.

## DISCUSSION

The State's appellate issues attack the trial court's findings and conclusions about Groves's consent to the officers' search. On that topic, the trial court made both a finding and a conclusion that "the search was not made with informed consent." Based on these, and on the added finding and conclusion that "no exigent circumstances existed" for the search, the court concluded that Groves's motion should be granted and ordered that "any evidence obtained" from the search "is excluded from evidence."

We infer from the trial court's ruling and findings and conclusions that the court also ruled that Groves had not given *voluntary* consent to the search. *See Pena*, 581 S.W.3d at 474 (trial court's ruling must be upheld on any legal theory applicable to the case, even if the theory is not one on which the trial court itself relied); *accord Hailey*, 87 S.W.3d at 122; *see also Tucker*, 369 S.W.3d at 184 (explaining that prior decision treated trial court's denial of motion to suppress absent findings and conclusions as including an "implicit finding of voluntary consent" (citing *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000))); *Meekins*, 340 S.W.3d at 458–60 (treating trial court's ruling as including finding that consent to search was voluntary when

9

trial court denied motion to suppress absent findings and conclusions). While some of the older consent cases speak of *informed* consent,[1] the more recent decisions of the Court of Criminal Appeals speak in terms of *voluntary* consent, *see Ruiz*, 581 S.W.3d at 786; *Tucker*, 369 S.W.3d at 184–85; *Meekins*, 340 S.W.3d at 458. Put simply, searches voluntarily consented to survive the Fourth Amendment, and those not voluntarily consented to, without some other legal justification, do not. We thus view the trial court's suppression order as based on a ruling that Groves did not voluntarily consent to the search. *See Montanez v. State*, 195 S.W.3d 101, 103, 105–09 (Tex. Crim. App. 2006) (analyzing defendant's "informed consent" argument under voluntary-consent standards).

In its second issue, the State contends that the trial court erred by granting the motion to suppress based on its ruling that Groves did not consent to the search. The State stipulated that its search here was without a warrant, so it was the State's burden in the trial court to prove its assertion of the consent exception to the warrant requirement. *See Martinez*, 569 S.W.3d at 624; *Amador v. State*, 221 S.W.3d 666, 672–73 (Tex. Crim. App. 2007). To evaluate the State's appellate contention, we consider the totality of the circumstances in the light most favorable to the trial court's decision. *See Granville*, 423 S.W.3d at 404; *Tucker*, 369 S.W.3d at 185; *Meekins*, 340 S.W.3d at 459; *Pena*, 581 S.W.3d at 474.

During the officers' first phone call to him, Roberts told Groves that the officers "are going to" seize the marijuana they saw but that they wanted to do so without causing property

---

[1] *See, e.g.*, *Williams v. State*, 668 S.W.2d 692, 699 (Tex. Crim. App. 1983) ("[A]ppellant's father, with full authority to do so, freely and voluntarily gave informed consent to the police entry of the house and the bedroom."); *Capello v. State*, 775 S.W.2d 476, 484 (Tex. App.—Austin 1989, pet. ref'd) ("Appellant also does not complain . . . that he did not . . . freely give his informed consent to the search.").

damage and with the least intrusion possible. Later during the first phone call, Roberts asked for Groves's consent to search the home to ward off the need for the officers to get a warrant. He mentioned property damage again during a later call with Groves. On cross-examination, Roberts agreed that "a fair conclusion from" the property-damage "statement" is that if the homeowner does not "do something, they're going to cause property damage and get into my house." Then during their next call, Roberts told Groves that if he did not give his consent for the officers to go inside, they would soon prepare a search warrant so they could go inside that day. The bodycam recording reflects these statements from the phone calls, and the trial court was within its rights to assess the officers' and Groves's respective tones of voice and demeanors and the officers' promises and language. *See Meekins*, 340 S.W.3d at 464 (stating that "evidence of factors that would tend to show coercion" include "an officer's display of a weapon, threats, promises, deception, physical touching, or a demanding tone of voice or language"); *Garcia-Cantu*, 253 S.W.3d at 248 ("The trial judge could have concluded that, based upon Officer Okland's tone and demeanor on the witness stand, as well as his tone and demeanor as seen and heard on the video recording, that the officer's questioning was more in the nature of an official command rather than a friendly or neutral inquiry."); *see also Tucker*, 369 S.W.3d at 187 n.1 (Alcalá, J., joined by Keller, P.J., concurring) (explaining that video evidence is rarely indisputable, and thus that interpreting video evidence is best left to factfinders, because factfinders often must interpret tones of voice, attitudes, and "any other pertinent matters" about the people and events depicted). Although the officers asked several times for Groves's consent to search the home and told him that he could revoke consent and gave him time to do so, the trial court's implicit view that the threat of property damage coerced Groves into giving consent, or that the officers conveyed that compliance with their request was required, is a permissible view of the officers' promises,

11

demeanor, and tone. *See Meekins*, 340 S.W.3d at 460 n.26, 465. Because the trial court's view of the evidence is a "permissible" one, we cannot reverse its suppression decision. *See id.* at 465. We thus overrule the State's second issue.[2]

## CONCLUSION

We affirm the suppression order.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: February 25, 2022

Do Not Publish

---

[2] We need not reach the State's first issue. *See* Tex. R. App. P. 47.1. In that issue, the State contends that the trial court's "informed consent" *finding of fact* is unsupported by the record and inconsistent with "conclusive evidence"—the bodycam recording—showing that the officers did indeed inform Groves of all relevant matters, including "the basis of the request to search, that he was not under threat of imminent arrest, that [the] officers th[ought] they had good PC (probable cause) for a search warrant," and his "right to withdraw consent and . . . instructions on how to exercise that right." Voluntariness review, as stated above, considers *all* the circumstances, not just one or another. *See Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012); *Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011). Thus, one factor alone does not turn the voluntariness inquiry. *United States v. Morales*, 171 F.3d 978, 983 (5th Cir. 1999) (per curiam); *Arcila v. State*, 788 S.W.2d 587, 591 (Tex. App.—Dallas 1990), *aff'd*, 834 S.W.2d 357 (Tex. Crim. App. 1992), *overruled in part on other grounds*, *Guzman v. State*, 955 S.W.2d 85, 90 (Tex. Crim. App. 1997); *accord State v. $217,590.00 in U.S. currency*, 18 S.W.3d 631, 634 (Tex. 2000). In this way, the factual matter of whether Groves's consent was informed, alone, would not dispose of this appeal, so we need not review that lone factual matter.

Nevertheless, "informed consent" can play a role elsewhere even if it is not dispositive here, for example, in cases involving either defendants who do not speak English, *see, e.g.*, *Arcila*, 788 S.W.2d at 592–93, or medical procedures like blood draws, *see, e.g.*, *Peddicord v. State*, 942 S.W.2d 100, 108 (Tex. App.—Amarillo 1997, no pet.).